# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
Assigned on Briefs October 8, 2013

## STATE OF TENNESSEE v. MICHAEL TYRONE GANT

**Direct Appeal from the Circuit Court for Bedford County**
No. 17314    Robert Crigler, Judge

_____

No. M2012-02727-CCA-R3-CD   Filed October 30, 2013

_____

A Bedford County jury found the Defendant, Michael Tyrone Gant, guilty of aggravated robbery, aggravated burglary, possession of a weapon by a convicted felon, and possession of a firearm during the commission of a felony. The trial court sentenced the Defendant to thirty years for the aggravated robbery conviction, a concurrent fifteen-year sentence for the aggravated burglary conviction, a consecutive six-year sentence for the possession of a weapon by a convicted felon conviction, and a consecutive twelve-year sentence for the possession of a firearm during the commission of a felony conviction for a total effective sentence of forty-eight years in the Tennessee Department of Correction. On appeal, the Defendant contends: (1) the evidence is insufficient to sustain his convictions; and (2) the trial court erred when ordering his sentences to run consecutively. After a thorough review of the record and applicable authorities, we conclude there exists no error in the judgments of the trial court. Accordingly, the judgments of the trial court are affirmed.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the Court, in which JAMES CURWOOD WITT, JR., AND ROGER A. PAGE, JJ, joined.

Andrew Jackson Dearing, III (at trial and on appeal) and Stephanie Barca (at trial), Shelbyville, Tennessee, for the appellant, Michael Tyrone Gant.

Robert E. Cooper, Jr., Attorney General and Reporter; David Findley, Senior Counsel; Robert Carter, District Attorney General; and Michael Randles, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION
### I. Facts

This case arises from the Defendant's unlawful entry into the victim's home in Bell Buckle, Tennessee. Inside the house, the Defendant held the victim at gunpoint while he took her pain medication, cash, and cellular phone. A Bedford County grand jury indicted the Defendant for theft under $500, aggravated robbery, aggravated burglary, possession of a weapon by a convicted felon, and possession of a firearm during the commission of a felony. The Defendant was acquitted of the theft under $500 charge, and found guilty on the remaining four charges.

## A. Trial

At the Defendant's trial, the parties presented the following evidence: The victim testified that at the time of trial, she had lived in Bell Buckle, Tennessee since 2008. The victim said she was disabled and not employed. She testified that on June 22, 2010, she received a phone call or a text from Daneile Jeffery, a friend of her son's, asking if Ms. Jeffery could "borrow" some prescription pain pills. The victim testified that she had a prescription for the pain medication from her doctor as a result of her disability. The victim said that after she agreed to give Ms. Jeffery the pills, a car pulled into the driveway of her home, and the victim went outside to meet it. Inside the car was Ms. Jeffrey and a man whom the victim identified in court as the Defendant. She said that Ms. Jeffrey got out of the car, asked if anyone else was "here," and the victim answered no. The two women went inside the victim's home, and the victim told Ms. Jeffery she did not want the Defendant to come inside. Ms. Jeffery went back outside to her car, and the victim watched her through the window of the house. Ms. Jeffery came back inside the house, at which point the victim went to lock the door behind her. The victim testified that before she could reach the door to lock it, the Defendant "pushed the door in on me and held a gun and said this is a robbery."

The victim testified that the Defendant pointed the "handgun" at her, and that she was "scared." She said the Defendant made her sit down on the floor, and he put his knee "in the back of [her] neck" with her head bent over. The victim said that the Defendant put the barrel of the gun up against the left side of her skull, behind her ear. The victim stated she was crying at that point. She recalled that the Defendant asked her where her pills were, and then he pointed the gun at Ms. Jeffery and told her to get the pills. The Defendant then went through the victim's purse, at which point her cellular phone rang. The Defendant took the victim's cellular phone from her purse and put it in his pocket. The victim said that Ms. Jeffery asked the Defendant, "Clint, why are you doing this[?]" The victim recalled that, while the Defendant still had the gun pointed at her head, Ms. Jeffrey retrieved the pills from the victim's bedroom, and the Defendant went through her purse again and took cash out of it. The victim stated that she did not give the Defendant her permission to take the pills, the

2

cash, or the cellular phone.

The victim testified that the Defendant also made Ms. Jeffery get on the floor and that she was crying and asking him "why [he was] doing this." The Defendant told the victim he was going to take her car keys and then said, "Bitch you are taking me where I need to go." The victim recalled that Ms. Jeffery was sitting in a chair at that point, and the Defendant was waving his gun around. She said Ms. Jeffery got up from the chair, and both she and the Defendant left the house and got in Ms. Jeffery's car. The victim noticed that the Defendant was driving. The victim stated that before the car pulled out of the driveway, she opened the front door and stuck her head where the Defendant could see her. She recalled that the Defendant pointed the gun at her again, and said, "Bitch get your ass back in the house." The Defendant then drove the car away, and the victim went to a neighbor's house to call the police. The victim testified she had never seen the Defendant before that day.

The victim testified that the sheriff's deputies responded to her call She recalled describing the Defendant to the deputy and telling the deputy that the robber's name was Clint. She took the deputies into her house, where they found her purse and car keys. She said that an estimated seventy pain pills had been taken, along with $180 to $200 cash and her cellular phone.

On cross-examination, the victim testified that she took four Percocet pain pills every day. She testified that Ms. Jeffery called her the day of the crime and asked to buy some Percocet pills from her and that she had sold pills to her three times before. The victim stated that she knew Ms. Jeffery's boyfriend had beat her up, and she knew Ms. Jeffery was in pain as a result of that abuse.

The victim testified that sheriff's deputies showed her a photographic lineup and that she positively identified the Defendant as the robber. She said her identification occurred at the sheriff's office on August 10, 2010. The victim maintained that the Defendant's photograph in the lineup was the man that came inside her house.

Daneile Jeffery testified that she had two children and a grandchild, and that she had known the victim for about eight months. She said that prior to June 22, 2010, she had been to the victim's house many times. She also said that prior to that day, she knew the Defendant for about three months and identified him in the courtroom. Ms. Jeffery stated that the Defendant's son and her daughter had a child together. Ms. Jeffery agreed that she contacted the victim by texting her and that she asked to buy some "pain pills" from her.

Ms. Jeffery testified that on the way to the victim's house, she stopped at a gas station where she saw the Defendant. Ms. Jeffery told the Defendant she was going to buy pain pills

3

from the victim.  The Defendant asked if he could ride with her because he wanted to "go over there anyway."  Ms. Jeffery agreed, and from the gas station she and the Defendant drove directly to the victim's house.  Ms. Jeffery said the Defendant stayed in the car while she went inside the victim's house.  She said that prior to going in, she told the Defendant that the victim did not want anybody in her house and that Ms. Jeffery was not supposed to have brought anyone with her.

Ms. Jeffery testified that once inside the house, she and the victim had a casual conversation and then Ms. Jeffery went back outside to her car to get her money.  She stated that she never made it to the car because the Defendant, brandishing a gun, instructed her to "[t]urn around and go back in the house."  Ms. Jeffery told him he could not go in the house, but as she turned around to go back in the house, the Defendant "pushed us both back in the door."  Inside the house, the Defendant started giving the two women instructions, with his gun out "the whole time."  She stated the Defendant ordered the victim to get on the floor, and that he was yelling at her and asking her if she had money or pills.  Ms. Jeffery said the Defendant was "pointing the gun everywhere" and "just going crazy."  She said the Defendant ordered her to get the victim's pills after she stated where they were located in the house.  She recalled that she retrieved the bottle and "slung" it at the Defendant.

Ms. Jeffery testified that the Defendant then ordered her to get on the ground and that he asked the victim where her purse was.  He told Ms. Jeffery to go through the victim's purse and wallet, which she stated she did not do, so the Defendant took the money out of the wallet himself.  Ms. Jeffery said that at this point she was lying on the ground on her stomach, and saw the Defendant take the victim's cellular phone.  She maintained that his handgun was visible during the entire incident.

Ms. Jeffery testified that the Defendant pointed the gun at her and said, "Let's go; let's go."  She said she got in  the passenger seat of the car, and the Defendant sat in the driver seat with the gun in his lap.  The Defendant told Ms. Jeffrey, "Don't do anything; don't move."  Ms. Jeffery said that when the victim came out of her house, the Defendant grabbed his gun and started waving it at the victim and said, "Get back in the house, bitch," among other things.  She said the victim was terrified.

Ms. Jeffery testified that she and the Defendant drove away from the house and that, at some point, the Defendant threw the victim's cellular phone out the window.  The Defendant drove to an apartment complex in Tullahoma, Tennessee, parked the car, got out, and walked away.  At that point, Ms. Jeffery got in the driver's seat and drove away.  Ms. Jeffery immediately called a detective with the Manchester Police Department and relayed the events from that day.

4

Ms. Jeffery testified that she met with Detective Gauther and Detective Brian Farris and identified the perpetrator of these events as the Defendant. Ms. Jeffery agreed that she was charged with theft and aggravated robbery for her role in these offenses. She said that, at the time of trial, these charges were still pending.

On cross-examination, Ms. Jeffery testified that she had no agreement or deal with the State in exchange for her testimony at the Defendant's trial. She agreed that she had prior convictions for obtaining a controlled substance by fraud, theft of property valued over $10,000, theft of property valued under $500, and introduction of contraband into a penal facility. Ms. Jeffery said that in this case, she was guilty of buying prescription drugs but not guilty of robbing anyone. She stated that she and the Defendant had never had an intimate relationship. She agreed that she was addicted to pain pills, in particular Lortab, Oxycodone, and Percocet.

Ms. Jeffery testified that she had bought pills from the victim on fifteen prior occasions, and that she would usually text the victim to arrange to buy the pills. Ms. Jeffery stated that she also had a prescription for Lortab, for which she could get 120 pills per month. In addition, she would buy approximately twenty pills per week from the victim. She stated that in the past she would take about thirteen pills each day, but that she had decreased that amount to three pills per day, consistent with her actual prescription.

Ms. Jeffery agreed that her daughter had a child with the Defendant's son, that she would go over to the Defendant's house and smoke crack, and that the Defendant was giving it to her and smoking it too. Ms. Jeffery denied calling the Defendant "Clint" on the day of the robbery and said she could not remember what name, if any, she had used when speaking to the Defendant inside the victim's house. Ms. Jeffery denied being high the morning of the robbery.

Ms. Jeffery testified that the Defendant had given her money for pills in the past but that he did not give her any on the day she went to buy from the victim. She testified that she went in the victim's house that day, realized she had left her money in the car, and when she went outside to get it, the Defendant was out of the car coming toward her. When she saw that the Defendant had a gun in his hand, she began backing up. Ms. Jeffery unequivocally testified that the Defendant was the person with her at the victim's house and was the person who committed the robbery.

Brian Farris, a Bedford County Sheriff's Department lieutenant, testified that he was dispatched on June 22, 2010 to the victim's home in Bell Buckle, Tennessee. The dispatcher stated the call was for an armed robbery. He testified that multiple officers from the sheriff's office responded to the call to the victim's home. He recalled that when he arrived at the

5

scene, he found the victim "distraught" and almost hysterical. The victim described the robber as a black male, approximately six-feet tall, wearing a white t-shirt. She said that Ms. Jeffery had called the man by the name "Clint."

Detective Farris testified that he was notified that Ms. Jeffrey had contacted the Tullahoma Police Department with information regarding the robbery. Ms. Jeffery contacted Detective Farris later that day to set up a meeting. Detective Farris stated that he met with Ms. Jeffery the following day at the Tullahoma FBI office and that Federal Agent Richard Poff sat in on their meeting. Detective Farris testified that he had a lengthy conversation with Ms. Jeffery about the events and that she hand wrote a statement for him. He reiterated that he did not promise anything to Ms. Jeffery in exchange for her statement. He stated that she identified the "gunman" as the Defendant.

Detective Farris testified that he also met with the victim. He said that he prepared a photographic lineup of six photographs and showed it to the victim. He told the victim that "if" she saw a picture of the person who robbed her to write a notation underneath the photograph. He stated that she looked at the photos and identified the Defendant as her perpetrator before he could leave the room. He described her recognition of the Defendant as "instantaneous" requiring no further discussion of her selection. The photographic lineup was introduced as an exhibit, and Detective Farris identified it for the jury as the lineup he had shown the victim.

Detective Farris testified that he showed the photographic lineup to the victim about a month and a half after the crime occurred. He explained that it is his preference to wait as long as possible after the crime, to allow the victim to get himself or herself together , and that, "[i]f a person can identify [a suspect] two days [after the crime], they should be able to identify the suspect three weeks later, a month later." He stated that the victim expressed "no doubt whatsoever" when she identified the Defendant in the lineup.

Detective Farris testified that he interviewed the Defendant on August 4, 2010, and that the Defendant said he had never been to Bedford County with Ms. Jeffery and that he knew nothing about a robbery. The Defendant stated that he "dealt in cocaine" and not in pills.

On cross-examination, Detective Farris testified that after meeting with Ms. Jeffery, he eventually decided to charge her in connection with this case and that he did not offer her any "deals." He testified that the photographic lineup shown to the victim was generated by a computer program. Detective Farris stated that, in his opinion, a victim should be able to identify someone who had committed a serious crime against them as many as one or two months after the crime.

6

The parties stipulated that the Defendant was a convicted felon on June 22, 2010. The Defendant testified that on June 22, 2010, he was living with his mother in Tullahoma, Tennessee. The Defendant agreed he was convicted of escape in 1992, convicted of attempt to commit a felony and burglary in the second degree in 1998, and convicted of receiving stolen property in 1987. He stated that on June 22, 2010, he had known Ms. Jeffery four or five months, and that his son had a "domestic relationship" with her daughter. He testified that he and Ms. Jeffrey had an "intimate relationship" and that she had asked him for money for pills in the past.

The Defendant testified that he did not see Ms. Jeffery on June 22, 2010. He stated that he did spend approximately seven hours with her on July 2, 2010. He stated that he had neither been to the victim's house, nor he had ever seen the victim before that day in court.

On cross-examination, the Defendant testified that, at the time of the alleged robbery, he was working on a neighbor's porch. The Defendant recalled speaking with Detective Farris. He told Detective Farris that he had nothing to do with the robbery but failed to mention his work on his neighbor's porch on June 22.

Based upon this evidence, the jury convicted the Defendant of aggravated robbery, aggravated burglary, possession of a weapon by a convicted felon, and possession of a firearm during the commission of a felony.

## B. Sentencing Hearing

At the Defendant's sentencing hearing, the trial court admitted into evidence the presentence report, including a victim impact statement, as well as certified copies of nine judgments of conviction against the Defendant. The trial court found that the Defendant had a prior conviction for aggravated robbery, making the present aggravated robbery conviction a 100 percent sentence. The trial court found that the Defendant was on parole at the time of his offenses and that, therefore, his sentence would run consecutively to the sentence for which he was on parole as required by law. The trial court found that the Defendant was a career offender based upon four prior aggravated robbery convictions, a prior aggravated burglary conviction, and a prior second-degree burglary conviction.

The trial court noted that the Defendant's mandatory minimum sentence for the aggravated robbery conviction, a Class B felony, was thirty years, to be served at 100%. The trial court imposed a fifteen-year sentence for the aggravated burglary conviction, a six-year sentence for the felon in possession of a handgun conviction, and a twelve-year sentence for the possession of a firearm during the commission of a dangerous felony conviction. The trial court found that alternative sentencing was not an option and that pursuant to Tennessee

Code Annotated section 39-17-1324(e)(1), the twelve-year sentence for the possession of a firearm during the commission of a dangerous felony conviction would run consecutively to the thirty-year sentence for the aggravated robbery conviction. The trial court also noted that possession of a firearm during the commission of a dangerous felony, a Class D felony, had a mandatory consecutive sentence to the dangerous felony.

In its consideration of consecutive sentencing, the trial court found that the Defendant had an "extensive" record of criminal activity and that he was a dangerous offender. The trial court found that the Defendant's behavior was indicative of his lack of regard for human life. On that basis, the trial court ordered (1) that the Defendant's sentence for aggravated burglary be served concurrently with his sentence for aggravated robbery; (2) the Defendant's sentence for felon in possession of a handgun and possession of a firearm during the commission of a felony be served consecutively; and (3) that his total effective sentence be served consecutively to his parole sentence. The trial court further made the following findings:

> I do find that given the history that this Defendant has, that length is justly deserved in relation to the seriousness of these offenses and no greater than that deserved for the offenses committed. And I also find the [*Wilkerson*] findings, in finding [the Defendant] a dangerous offender, that consecutive sentences – the consecutive sentence [for] felon in possession of a handgun, [is] reasonably related to the severity of the offenses committed. That it is congruent with general principles of sentencing given the seriousness of these offenses and that it also serves to protect the public from further criminal conduct by the offender.

Accordingly, the trial court imposed a total effective sentence of forty-eight years. It is from this judgment that the Defendant now appeals.

## II. Analysis

On appeal, the Defendant contends that the evidence is insufficient to sustain his convictions. He further challenges the trial court's imposition of consecutive sentencing. The State responds that sufficient evidence was presented for the jury to find the Defendant guilty beyond a reasonable doubt as to all of the charges. The State also argues that the trial court properly sentenced the Defendant to consecutive sentences based upon his extensive criminal history.

### A. Sufficiency of the Evidence

The Defendant contends that the evidence is insufficient to sustain his convictions because "there just was not enough evidence to prove beyond a reasonable doubt all the elements of the crime charged." The Defendant contends that the evidence presented was highly circumstantial and that the proof at trial from the State's witnesses was "contradicting" and their stories not believable. The State responds that the victim's testimony established that the Defendant committed these crimes and that the proof presented to the jury was sufficient to establish all elements of the convictions. We agree with the State.

When an accused challenges the sufficiency of the evidence, this Court's standard of review is whether, after considering the evidence in the light most favorable to the State, "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see* Tenn. R. App. P. 13(e); *State v. Goodwin*, 143 S.W.3d 771, 775 (Tenn. 2004) (citing *State v. Reid*, 91 S.W.3d 247, 276 (Tenn. 2002)). This rule applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. *State v. Pendergrass*, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999). In the absence of direct evidence, a criminal offense may be established exclusively by circumstantial evidence. *Duchac v. State*, 505 S.W.2d 237, 241 (Tenn. 1973). The jury decides the weight to be given to circumstantial evidence, and "[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury." *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006) (citations omitted). "The standard of review [for sufficiency of the evidence] 'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

In determining the sufficiency of the evidence, this Court should not re-weigh or reevaluate the evidence. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Nor may this Court substitute its inferences for those drawn by the trier of fact from the evidence. *State v. Buggs*, 995 S.W.2d 102, 105 (Tenn. 1999); *Liakas v. State*, 286 S.W.2d 856, 859 (Tenn. 1956). "Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997); *Liakas*, 286 S.W.2d at 859. "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978); *State v. Grace*, 493 S.W.2d 474, 479 (Tenn. 1973). The Tennessee Supreme Court stated the rationale for this rule:

This well-settled rule rests on a sound foundation. The trial judge and

9

the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

*Bolin v. State*, 405 S.W.2d 768, 771 (Tenn. 1996) (citing *Carroll v. State*, 370 S.W.2d 523 (Tenn. 1963)). This Court must afford the State of Tennessee the strongest legitimate view of the evidence contained in the record, as well as all reasonable inferences which may be drawn from the evidence. *Goodwin*, 143 S.W.3d at 775 (citing *State v. Smith*, 24 S.W.3d 274, 279 (Tenn. 2000)). Because a verdict of guilt against a defendant removes the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict. *State v. Carruthers*, 35 S.W.3d 516, 557-58 (Tenn. 2000).

### 1. Aggravated Robbery Conviction

The Defendant contends that there is insufficient evidence to prove beyond a reasonable doubt all of the elements required for an aggravated robbery conviction. He argues that the evidence presented is "highly circumstantial," and does not justify a guilty verdict.

A conviction for aggravated robbery, as relevant to this case, requires proof beyond a reasonable doubt that the Defendant committed an "intentional or knowing theft of property from the person of another by violence or putting the person in fear" and that the robbery was "accomplished with a deadly weapon or by display of any article fashioned to lead the victim to reasonably believe it to be a deadly weapon." T.C.A. §§ 39-13-401(1), -402(1) (2010).

The evidence in this case, viewed in the light most favorable to the State, shows that the Defendant entered the victim's home with a handgun, ordered the victim onto the floor, and held the handgun to the back of her skull while he ordered Ms. Jeffery to take the victim's prescription pain pills from her bedroom. While holding the gun on the victim, he went through her purse and took cash from her wallet, as well as her cellular phone, without the victim's permission. The victim unequivocally identified the Defendant in a photographic lineup and, again, in the courtroom at trial as the man who entered her home, held a gun to her head, and took her pain pills, cash, and cellular phone without her consent. We hold this is sufficient evidence upon which a jury could find the Defendant guilty beyond a reasonable doubt of aggravated robbery.

As to the Defendant's contention that the evidence is circumstantial, pursuant to *Dorantes*, our review is the same whether the conviction is based on circumstantial or direct evidence. *See State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)). It is the jury's role to determine the weight of the evidence, circumstantial or direct, and the inferences to be drawn from the evidence. *State v. Sisk*, 343 S.W.3d 60, 67 (Tenn. 2011). The Defendant is not entitled to relief on this issue.

## 2. Aggravated Burglary Conviction

The Defendant makes a similar argument relevant to his aggravated burglary conviction, contending that the evidence and testimony as to his "intentions" was purely speculative and that the State did not meet its burden of proof beyond a reasonable doubt.

The Defendant committed aggravated burglary if the evidence proved that he intentionally, knowingly, or recklessly entered a habitation without the effective consent of the owner, with the intent to commit a felony, theft, or assault. *See* Tenn. Code. Ann. §§ 39-14-402, 39-14-403, 39-14-401(1)(A), (3) (2010).

The evidence, viewed in the light most favorable to the State, shows that Ms. Jeffery told the Defendant she was going to the victim's house to buy pain pills, and the Defendant asked to join Ms. Jeffery. Once at the house, the victim did not want the Defendant to enter her home. Ms. Jeffery testified that the victim told her she did not want the Defendant in the house and that Ms. Jeffrey conveyed this to the Defendant. Ms. Jeffery and the victim testified that the Defendant forced his way through the victim's door and inside the house, while brandishing a weapon. Once inside the house, he ordered the victim to the floor at gun point while he took the victim's pain pills, money, and cellular phone. Based on this evidence, the jury could infer that it was the Defendant's intent to enter the victim's house without her consent to steal money and pain pills. Thus, there was sufficient evidence to support the jury's finding the Defendant guilty of aggravated burglary.

## 3. Possession of a Handgun by a Felon Conviction

The Defendant contends that the proof at trial does not show he was in possession of a handgun, and he challenges the credibility of the victim and Ms. Jeffery regarding his possession of a handgun.

"Possession of a handgun by a convicted felon" is defined as possession of a handgun by an individual convicted, *inter alia*, of a felony offense involving a weapon. T.C.A. § 39-17-1307(b)(1)(A) (2010).

The evidence, viewed in the light most favorable to the State, shows that the Defendant was a convicted felon at the time of these events. He entered the victim's house with a gun and held her at gun point while he took her pain pills, money, and cellular phone. The victim testified that the Defendant held the gun to her head while Ms. Jeffery testified that the Defendant had the gun out "the whole time." Moreover, even after getting into Ms. Jeffery's car to leave, he once again held up the gun and threatened to shoot the victim.

The Defendant contends that the State's witnesses' testimony was "contradicting" and "not believable." The Defendant fails, however, to identify what testimony he references, and he risks waiver of this issue by failing to make the appropriate citation to the record. *See* Tenn. R. Crim. App. 10(b) (stating that "[i]ssues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived by this court.")

Even so, based upon the evidence presented, a jury could find beyond a reasonable doubt that the Defendant was a convicted felon on June 22, 2010, when he entered the victim's home brandishing a gun to commit a theft. The Defendant is not entitled to relief on this issue.

### 4. Possession of a Handgun during a Dangerous Felony Conviction

The Defendant contends that the evidence was insufficient to sustain this conviction because there was no evidence of his "intent to employ the weapon[.]"

The offense of "possessing a firearm during the commission of a dangerous felony" provides that it is an "offense to possess a firearm with the intent to go armed during the commission of or attempt to commit a dangerous felony[,]" as well as it is an offense to "employ a firearm" during the commission of a dangerous felony or an attempt to commit a dangerous felony. *See* T.C.A. § 39-17-1324(a), (b) (2010). Aggravated burglary is an enumerated "dangerous felony" in the statute. *See* T.C.A. § 39-17-1324(i)(1)(H) (2010).

The evidence, viewed in the light most favorable to the State, shows that the Defendant used a handgun to enter the victim's home against her will. He then forced the victim to the ground and held the gun to her head while he stole her pain pills, money, and cellular phone. The testimony at trial supports a finding that the Defendant held the handgun in plain view throughout the commission of the aggravated burglary. This is evidence sufficient to support that in the commission of a dangerous felony, as contemplated by the statute, the Defendant "employed" a firearm.

We conclude that there was sufficient evidence to support the jury's finding of guilt

beyond a reasonable doubt as to each of the Defendant's four convictions. The Defendant is not entitled to relief on this issue.

## B. Sentencing

The Defendant contends that the trial court erred when it ordered consecutive sentences for two of his convictions and that he should have been granted concurrent sentences for all four convictions. He argues that in imposing consecutive sentences, the trial court did not impose the "least severe measure necessary to protect the public" and that he should have received a "minimum sentence." The State counters that the effective sentence imposed complies with the purposes of sentencing, and that the record supports the conclusion that the public needs to be protected from the Defendant, and thus, the sentence is reasonable.

The Tennessee Criminal Sentencing Reform Act of 1989 and its amendments describe the process for determining the appropriate length of a defendant's sentence. Under the Act, a trial court may impose a sentence within the applicable range as long as the imposed sentence is consistent with the Act's purposes and principles. T.C.A. § 40-35-210(c)(2), (d) (2012); *see State v. Carter*, 254 S.W.3d 335, 343 (Tenn. 2008). In 2005, the Tennessee General Assembly amended the sentencing law in order to bring Tennessee's sentencing scheme into compliance with United States Supreme Court rulings on the subject. *See United States v. Booker*, 543 U.S. 220 (2005); *Blakely v. Washington*, 542 U.S. 296 (2004).

Before the 2005 amendments to the Sentencing Act, both the State and a defendant could appeal the manner in which a trial court weighed enhancement and mitigating factors applied to the defendant's sentence. T.C.A. § 40-35-401(b)(2) (2004). The 2005 amendments, however, deleted, as grounds for appeal, a claim that the trial court did not properly weigh the enhancement and mitigating factors. *See* 2005 Tenn. Pub. Acts ch. 353, §§ 8, 9. As a result, the appellate courts were "left with a narrower set of circumstances in which they might find that a trial court has abused its discretion in setting the length of a defendant's sentence." *Carter*, 254 S.W.3d at 345-46.

Appellate review of sentences has been *de novo* with a presumption of correctness. *See* T.C.A. § 40-35-401(d) (2012). In a recent decision, the Tennessee Supreme Court reviewed changes in sentencing law and the impact on appellate review of sentencing decisions. *State v. Bise*, 380 S.W.3d 682 (Tenn. 2012). The Tennessee Supreme Court announced that "sentences imposed by the trial court within the appropriate statutory range are to be reviewed under an abuse of discretion standard with a 'presumption of reasonableness.'" *Id.* at 708; *State v. Caudle*, 338 S.W.3d 273, 278-79 (Tenn. 2012) (explicitly applying the same standard to questions related to probation or any other

13

alternative sentence).

A finding of abuse of discretion "'reflects that the trial court's logic and reasoning was improper when viewed in light of the factual circumstances and relevant legal principles involved in a particular case.'" *State v. Shaffer*, 45 S.W.3d 553, 555 (Tenn. 2001) (quoting *State v. Moore*, 6 S.W.3d 235, 242 (Tenn. 1999)).

In conducting its review, this Court considers the following factors: (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on enhancement and mitigating factors; (6) any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; (7) any statement by the appellant in his own behalf; and (8) the potential for rehabilitation or treatment. *See* T.C.A. §§ 40-35-102, -103, -210 (2012); *see also Bise*, 380 S.W.3d at 697-98. The burden is on the appellant to demonstrate the impropriety of his sentence. *See* T.C.A. § 40-35-401, *Sentencing Comm'n Cmts*.

Our review of the record reflects that the trial court did not err when it ordered partial consecutive sentencing. The Defendant's criminal record consists of four prior aggravated robbery convictions, two felony escape convictions, one aggravated burglary conviction, one assault conviction, one second-degree burglary conviction, and six other convictions. The trial court imposed partial consecutive sentencing, pursuant to Tennessee Code Annotated section 40-35-115, on the basis that the Defendant was an offender with a "record of criminal activity that is extensive." *See* T.C.A. § 40-35-115(b)(2). The trial court also found that the Defendant was a dangerous offender and that he held "little or no regard for human life" and had "no hesitation about committing a crime" where the risk to human life would be high. *See* T.C.A. § 40-35-115(b)(4). The trial court noted that given the Defendant's criminal history, the length of his sentence was "justly deserved" considering the seriousness of his convictions.

Furthermore, the trial court classified the Defendant as a dangerous offender in imposing consecutive sentencing and properly considered the requisite *Wilkerson* factors in doing so. *State v. Wilkerson*, 905 S.W.2d 933 (Tenn. 1995). In order for a court to find a Defendant should serve his sentences consecutively based on his classification as a dangerous offender, *see* T.C.A. § 40-35-115(b)(4) (2003), the four *Wilkerson* factors must be satisfied: (1) the Defendant's behavior indicated little or no regard for human life; (2) he did not hesitate to act when the risk to human life was high; (3) extended confinement is necessary to protect society; and (4) the total length of the sentence must reasonably relate to the conviction offenses. *State v. Imfeld*, 70 S.W.3d 698, 708 (Tenn. 2002); *Wilkerson*, 905

S.W.2d at 939.

The trial court stated that the Defendant's "behavior" indicated that he had "little or no regard" for human life, and "no hesitation" about committing a crime when the risk to human life is high. The trial court found that, "given the history that [the Defendant had]," the total length of his sentence was "justly deserved in relation to the seriousness of these offenses and no greater than that deserved for the offenses committed." The court noted that consecutive sentencing was "congruent" with the principles of sentencing, "given the seriousness of these offenses" and given that it would "protect the public from further criminal conduct by this offender." The trial court, on this basis, ordered consecutive sentencing.

We conclude that the trial court did not err by ordering consecutive sentencing for the Defendant. Given that the Defendant has four prior aggravated robbery convictions and a prior aggravated burglary conviction, we agree that the Defendant has shown no hesitation about committing crimes when the risk to human life is high. The facts of his current conviction, where he held the barrel of a gun against his victim's head and waved the gun around in the presence of the victim and Ms. Jeffery, indicate that his regard for the risk to human life is low. Moreover, his multiple felony convictions involving the use of a weapon in the past and in the case at bar indicate that it is necessary to protect the public from this Defendant committing additional aggravated crimes in the future. The evidence supports the trial court's finding that the Defendant should serve his sentences consecutively. The Defendant is not entitled to relief.

### III. Conclusion

Based on the record and aforementioned authorities, we conclude that the evidence is sufficient to sustain the Defendant's convictions and that the trial court did not err when it sentenced him. We, therefore, affirm the judgments of the trial court.

_____
ROBERT W. WEDEMEYER, JUDGE

15